IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kelli Nolan,                                                                 Case No. 3:20-cv-858-JGC

        Plaintiff,

v.                                                                           **ORDER**

Ohio Department of Rehabilitation
and Correction, Marion Correctional
Institution,

        Defendant.

        Plaintiff Kelli Nolan brings this action against her employer, the Ohio Department of Rehabilitation and Correction ("ODRC"), Marion Correctional Institution ("MCI"), claiming that it violated Title VII, 42 U.S.C. § 2000(e), *et seq.* She claims that MCI disciplined her on the basis of her gender and retaliated against her for asserting her gender-discrimination claim. The parties have filed summary judgment motions (Docs. 25, 26), which are now fully briefed and ripe for decision.

        For the reasons stated below, I grant defendant's motion and deny plaintiff's motion.

## Background

        Nolan began working as a corrections officer at MCI in June 2007. (Doc. 25, pgID 1947); (Doc. 26, pgID 1981). She complains of two 2018 incidents in which she alleges MCI imposed harsher discipline on her than it had imposed on similarly situated male corrections officers.[1] *See*

---

[1] Nolan also seeks to challenge disciplinary action MCI took against her in 2016 after she engaged in a profane argument with a male MCI corrections officer. (Doc. 25, pgID 1950-51,

(Doc. 25, pgID 1951-53). One incident involved her attendance at and participation in the criminal trial of her friend, Micah McCoy (the "McCoy Incident"). The second involved her being late for work on January 30, 2019 (the "Attendance Incident").

Nolan also seeks to challenge a five-day suspension that MCI imposed on her for insubordination in August 2020. MCI did so after she refused a superior's order to allow an Aramark employee, who had forgotten her identification, to return to her vehicle unescorted to retrieve it (the "Aramark Incident").[2]

### The McCoy Incident

In the first of these incidents, MCI sanctioned Nolan for conduct in a state court criminal proceeding on behalf of a childhood friend, Micah McCoy. (Doc. 1, pgID 3); (Doc. 26, pgID 1984-85). First, on December 14, 2018, Nolan attended McCoy's trial in full uniform, took notes, and conferred with him, while he was sitting at the defense counsel's table during breaks in the trial. (Doc. 18, pgID 159-61, 165); *see also* (Doc. 24-1, pgID 1722).

Subsequently, Nolan, on McCoy's behalf, contacted the probation officer in charge of performing McCoy's presentence investigation. (Doc. 18, pgID 168-69). She testified that she did so to obtain answers to some of the questions McCoy had asked her regarding the sentencing process. (*Id.*). During the conversation, Nolan mentioned to the probation officer that she was a

---

1955). She initially filed an Equal Employment Opportunity Commission charge regarding that action, claiming she received harsher discipline than MCI imposed on the male officer. (Doc. 18, pgID 151-52, 155-57). However, she voluntarily withdrew her EEOC charge on July 24, 2018. (Doc. 24-1, pgID 1691-92, 1700). The EEOC issued a right to sue letter to her on August 13, 2018. She did not file a lawsuit regarding her claim within the ninety-day filing limitation imposed by 42 U.S.C. § 2000e-5(f). Therefore, she may not pursue any claim relating to the 2016 disciplinary action. *See, Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149-50 (1984); *see also Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (2000) ("The federal courts have strictly enforced Title VII's ninety-day statutory limit.").

[2] As discussed in Section F, *infra*, Nolan's claim regarding the Aramark Incident is not properly before me in this action.

corrections officer at MCI. (*Id.*). The probation officer's notes reflect that she "kind of" felt or believed Nolan was attempting to influence the outcome for her friend. (Doc. 24-1, pgID 1795).

On December 28, 2018, Nolan appeared in civilian clothing during sentencing as a character witness on McCoy's behalf. Nolan did not seek prior permission from MCI officials to testify at McCoy's sentencing.

In her testimony, she identified herself as an eleven-year veteran corrections officer with ODRC. Defendant points to the following statements that Nolan made during her testimony as showing that she attempted to use her position to influence the court on McCoy's behalf:

> • "…I've worked for the Ohio Department of Rehabilitation and Correction for 11 years so a lot of [McCoy's] friends are fellow corrections officers at various institutions."
>
> • "I believe [McCoy] to be a patriot as I am who loves his country and those who serve and protect it whether be green, blue or in my case grey [referring to her Department issued uniform]."
>
> • "To hear someone say [McCoy] made a threat towards law enforcement, to me, was an absurd and gross distortion of the truth. That would never happen in my opinion."
>
> • "Not long ago myself and other co-workers and friends of [McCoy's] who work at other institutions, we actually attempted to get him hired on with us with the department."
>
> • "[McCoy] did go through the process of the [Department] application."
>
> • "I believe that he would have been an excellent correction officer."
>
> • "[McCoy] has always been a productive and contributing citizen to the community so I ask you to show him leniency."
>
> . • "I don't feel, you know, working in a correctional facility, I don't feel he is gonna [sic] do the community any justice inside a correctional facility."

(Doc. 26, pgID 1986) (internal citations omitted) (quoting Doc. 24-1, pgID 1724-25).

3

A pre-disciplinary hearing notice charged Nolan of committing the following misconduct: 1) wearing her uniform to attend McCoy's trial; 2) speaking with McCoy's probation officer, mentioning that she was an MCI corrections officer; 3) giving a verbal character witness statement in which she identified herself as an MCI corrections officer and seeking leniency on McCoy's behalf; 4) failing to obtain MCI's permission to appear at McCoy's sentencing; and 5) lying during her interview with investigating officers about information she allegedly had provided to a prison official concerning her prior relationship with McCoy. (Doc. 24-1, pgID 1715).

Hearing Officer Patty Fitch held a pre-disciplinary hearing on February 28, 2019. (Doc. 24-1, pgID 1718). In her hearing report, dated March 7, 2019, Fitch found that Nolan was guilty of misconduct and violated prison rules. Specifically, she found Nolan: 1) failed to follow post orders, administrative regulations, policies, or written or verbal directives; 2) misused her official position for personal gain, which included accepting or soliciting bribes in the course of carrying out assigned duties; 3) committed unauthorized use, release or misuse of information; 4) interfered with, failed to cooperate in, or lied during an official investigation or inquiry; and 5) committed acts that would bring discredit to the employer. (*Id.*, pgID 1720-21).

Philip Rader, Labor Relations Officer ("LRO"), was responsible for making disciplinary recommendations to the Warden. (Doc. 19, pgID 407). Rader recommended that termination was the appropriate discipline for Nolan's actions in connection with McCoy's trial. (*Id.*, pgID 415). MCI's Warden, Lyneal Wainwright, accepted that recommendation and terminated Nolan's employment. (Doc. 24-1, pgID 1803).

Nolan filed a grievance challenging her termination. (*Id.*, pgID 1775-76). Also, as part of his LRO duties, Rader represented MCI in the grievance proceedings. (Doc. 19, pgID 407-08).

MCI rejected Nolan's grievance during the two-step internal grievance procedure. (Doc. 24-1, pgID 1776).

Nolan then filed for arbitration. *See* (*Id.*, pgID 1777). The arbitrator issued a decision on May 26, 2020, modifying the sanction for Nolan's rules violations. He reinstated Nolan to her position without loss of seniority. (*Id.*, pgID 1797-98). However, he did not award her any damages; essentially, he reduced her sanction to the fourteen months she had been off work without pay. (*Id.*, pgID 1797).

Although the arbitrator reduced Nolan's punishment, he did not absolve her of responsibility for her actions in the McCoy Incident. Instead, he found that she had committed sanctionable conduct, but that termination was too harsh a sanction. As he explained: "Was her conduct worthy of Discipline? Yes. Did it warrant the Removal of an extensively trained and active Corrections Officer with 11 plus years of service? No." (*Id.*, pgID 1796). Nolan returned to work on June 1, 2020. (*Id.*, pgID 1799).

### The 2018 Attendance Violation

On January 30, 2019, Nolan was approximately 1.4 hours late for her assigned shift. (*Id.*, pgID 1749). She submitted a leave request for 1.4 hours through the prison's computerized system to cover her late arrival, but she did not have any remaining leave or compensatory time to cover the request. (*Id.*). When the system would not accept her leave request because she had no remaining time, she submitted a written request for leave to her supervisor, Lieutenant Hashman, which he denied. (*Id.*, pgID 1758). The Warden imposed a two-day working suspension as discipline for this incident. (*Id.*, pgID 1774).

5

**Summary Judgment Standard**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

"Where, as here, parties have filed countermotions for summary judgment, the Court grants or denies each motion for summary judgment on its own merit, applying the standards described in Fed. R. Civ. P. 56." *Williams v. Ohio Dep't. of Rehab. & Corr.*, No. 3:15-CV-388, 2018 WL 500167, *1 (S.D. Ohio).

**Discussion**

**A.  Legal Standard for Employment Discrimination Claims**

Because Nolan does not contend that she has direct evidence of discriminatory intent, the *McDonnell Douglas v. Green* burden-shifting analysis applies to her employment discrimination claims. 411 U.S. 792, 802 (1975). In that analysis, Nolan bears the initial burden to establish a *prima facie* case of discrimination. If she succeeds, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for her termination. If the defendant articulates such a reason, the burden shifts back to Nolan to establish that the proffered reason was not the real reason for its action, but is a pretext concealing discriminatory animus. *Tennial v. United*

6

*Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing, *McDonnell Douglas*, *supra*, 411 U.S. at 802).

To establish a *prima facie* case, Nolan must show: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Id.*

In her attempt to satisfy this standard's fourth element, Nolan alleges that MCI treated similarly situated male employees more favorably. She may properly establish that claim by making this comparison only if the male employees, whom she has identified, are "similarly situated in all relevant respects" to her. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016).

### B. Nolan's Claim Regarding the McCoy Incident

Nolan does not challenge MCI's rendition of the essential facts regarding the McCoy Incident. Instead, she argues that MCI treated a similarly situated male corrections officer, Dustin Smith, more leniently than it treated her.

Therefore, she must establish that Smith is similarly situated in all relevant respects and has engaged in acts of comparable seriousness." *Tennial, supra*, 840 F.3d at 304. Nolan has not met that standard.

Smith's violation and Nolan's violations were substantially dissimilar.

MCI disciplined Smith because it found that he was eating dinner on February 17, 2019 at 5:00 p.m. with his wife, infant child, and two friends at a restaurant that served alcohol while

7

wearing his MCI uniform.[3] (Doc. 21, pgID 903, 907). MCI punished Smith for that rule violation with a written reprimand. (*Id.*, pgID 898).

In contrast, Nolan engaged in more than one instance of rule violations. She attended a criminal trial on behalf her friend, McCoy, in full uniform. She took notes for McCoy, and during breaks, she sat at the defense counsel's table and conferred with McCoy in open court. She then called McCoy's probation officer, who was preparing the presentence investigation report for him. During that call, Nolan, in effect, cloaked herself in a virtual uniform, identifying herself both as McCoy's friend and a corrections officer in an apparent effort to curry favor with that officer on her friend's behalf.

Nolan then attended and testified in McCoy's support at sentencing. Although Nolan did not wear her uniform in court, she once again virtually cloaked herself in the grays worn by corrections officers by identifying herself as an eleven-year veteran of the ODRC. She stated that a lot of McCoy's friends were correction officers and that they tried to recruit McCoy to join them. She criticized the prosecution's charges as an "absurd and gross distortion of the truth." She asked the jury to show leniency and argued, based on her experience as a member of the ODRC, that McCoy was not "gonna [sic] do the community any justice inside a correctional facility." (Doc. 24-1, pgID 1724-25). And she did all this without informing her superiors either before or after having done so.

This conduct went far beyond Smith's single incident of wearing his uniform to dinner with his wife and infant daughter at 5:00 on a Sunday afternoon. Conversely, Nolan committed multiple violations over a two-week period in her efforts to use her status and experience as a

---

[3] The evidence reflects that the establishment in question was a pizzeria that served alcoholic beverages (Doc. 21, pgId 900). There is no reflection in the record, however, that Smith consumed any alcohol, and Nolan does not contend otherwise.

corrections officer to help her friend is sufficient. This distinction alone establishes she was not similarly situated to Smith for disciplinary purposes.

In addition, it was entirely reasonable for prison officials to view Nolan's and Smith's conduct as not "acts of comparable seriousness," *Tennial, supra*, 840 F.3d at 304. Smith's failure to change out of his uniform before having dinner in public with his wife and child was a rule violation. It could have given the impression that he might be receiving some benefit – such as free food – because of his position as an MCI corrections officer.

In contrast to the appearance of impropriety, Nolan attempted to leverage her position as a corrections officer to influence a judge into giving her friend a more lenient sentence. And she did so in open court during a criminal sentencing hearing.

Because of these distinctions, a jury could not rationally conclude that Smith was not a valid comparator to Nolan.

### C. The Attendance Violation

On January 30, 2019, Nolan encountered car trouble and needed to have her car towed. (Doc. 24-1, pgID 1757). As a result, she was more than one hour late for her work shift. (*Id.*). She attempted to request leave through MCI's time-keeping system to cover her missed time but was unable to do so because she had no leave available. (*Id.*, pgID 1752). MCI issued a two-day working suspension as discipline. (*Id.*, pgID 1774).

MCI follows a two-track disciplinary system: an Absenteeism Track and a Performance Track. "The two tracks are separate and distinct for discipline purposes." (*Id.*, pgID 1632). It assigns progressively more serious sanctions for each additional violation along the same tract. (*Id.*). For example, for the first incidence of a failure to follow proper call-off procedure, MCI

would assign either a written reprimand or a one-day suspension. (*Id.*, pgID 1636). For a second such violation, MCI would impose a two-day suspension. (*Id.*).

When MCI issued Nolan the two-day suspension for the January 30, 2019 incident, she already had a prior Absenteeism Track violation from July 10, 2018, for which MCI had issued her a written reprimand. (*Id.*, pgID 1702). The two-day suspension was the appropriate sanction in accordance with MCI's disciplinary grid for a second Absenteeism Track violation.

In response, Nolan claims that two male comparators received lesser discipline for the same attendance violations: Ryan Pakish and Nolan Smith.

### (i) Ryan Pakish

Nolan argues that she was similarly situated to Pakish regarding Absenteeism Track violations but received a harsher sanction than he. Pakish committed two Absenteeism Track violations in the same week on September 15 and 18, 2018. (Doc. 27-1, pgID 2042).[4]

Under MCI's disciplinary policy, MCI had discretion regarding how to treat two violations committed in close temporal proximity. Its policy provided that: "[t]he Appointing Authority shall consider the similarity and proximity in time of the offenses when contemplating disciplinary action. The Department *may* repeat disciplinary penalties for repeat violations of a similar nature when offenses occur in close proximity in time." (Doc. 24-1, pgID 1633) (emphasis added). Prison authorities chose to treat the two events as a single disciplinary

---

[4] MCI argues that I should not consider the documents Nolan cites from Pakish's and Smith's disciplinary records because they are unauthenticated hearsay. MCI ignores the fact that these documents appear to have come from its own records. Absent a more specific explanation of the basis for a well-grounded objection, I will deem these records authentic for purposes of this order. As to MCI's hearsay objection, likewise, absent a more specific and less conclusory objection, I deem those records to be admissible for purposes of this order under Fed. R. Evid. 803(6), (8).

incident and issued a written reprimand for a first Absenteeism Track violation. (Doc. 27-1, pgID 2042).

Under the written policy, Nolan simply was not eligible to receive the same treatment as Pakish because her Absenteeism Track violations were six months, rather than three days, apart. Thus, pursuant to the terms of MCI's policy, Nolan was not similarly situated to Pakish. A jury could not reasonably conclude that he was a valid comparator to Nolan.

### ii) Dustin Smith

In addition to the Performance Track violation involving wearing his uniform to dinner discussed in Section B, *supra*, Smith also committed an Absenteeism Track violation on January 13, 2018. (*Id.*, pgID 2039). That violation was his first on the Absenteeism Track. (Doc. 28-1, pgID 2072). In keeping with its written policy, MCI issued Smith a written reprimand. (Doc. 27-1, pgID 2040).

In a progressive disciplinary process, a person who has committed only one violation is not similarly situated to a person who has committed more than one violation. *See Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008); *see also Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1050 (M.D. Tenn. 2011) ("The disciplinary history of the plaintiff is a crucial variable . . . particularly under a 'progressive discipline' scheme."). A jury could not reasonably find Smith to be a valid comparator to Nolan for Absenteeism Track violations.

### D. Nolan's Argument that Warden Wainright Admitted that Nolan Did Not Violate MCI's Rules

Nolen contends that Warden Wainwright "could not honestly believe Nolan should be removed from her position." (Doc. 31, pgID 2106). She says this is so because no MCI rule or policy specifically prohibits testifying in court or stating where she worked. Nolan also argues that Wainwright testified that her conduct was permissible. Neither argument has merit.

Whether MCI properly interpreted its rules to prohibit Nolan's conduct, however, is not the dispositive issue. "'The central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin. . . .' Without evidence that a similarly situated individual outside of the protected class was treated more favorably, there is no other basis in this case from which to infer discrimination." *Doucet v. Univ. of Cincinnati*, No. 06-4118, 2007 WL 2445993, at *5 (6th Cir.) (quoting *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577 (1978)).

Nolan's argument that Warden Wainwright admitted that her conduct did not violate ODRC rules also fails. Nolan bases that argument entirely on the following two colloquies from Wainwright's deposition. The first colloquy was:

> Q: Do you know anyone at [MCI] while you worked there who ever had a relative who was arrested?
>
> A: Yes.
>
> Q: And with respect to that person who had a relative who was arrested, is there a policy that would disallow them from testifying on behalf of the relative for sentencing reasons?
>
> A: No.

(Doc. 22 pgID 945-46).

This testimony is far too generalized to prove Nolan's point. It does not address under what conditions an MCI employee properly could testify at a criminal sentencing. For example, chief among those conditions could be a requirement that the employee clear his or her appearance with prison officials beforehand. The employee also may well have been instructed not to indicate who his or her employer was. She also likely would have been instructed not to use their employment by ODRC as a source of her expertise to support her opinions that the charges against her friend were an "absurd and gross distortion of the truth" and that her friend

12

was not "gonna [sic] do the community any justice inside a correctional facility." (Doc. 24-1, pgID 1724-25).

Nolan's counsel's hypothetical question simply was not specific enough to establish Nolan's claim that Wainwright testified that Nolan's own specific conduct was permissible.

The second deposition colloquy on which Nolan relies is similarly lacking in specificity:

Q: Would it be improper for a criminal defendant who was on trial when asked where he worked to state if he in fact did work at [MCI]?

A: If he was asked . . . .

Q: And is there a policy written by the ODRC that you know of that prohibits an employee at the department who works for ODRC from indicating in any public forum

A: No, they can state where they are employed.

(Doc. 22, pgID 945-46).

Wainwright's generalized statement that employees may state where they are employed does not address Nolan's conduct. It is one thing to state that one is employed by the ODRC. It is quite another to do so in a criminal proceeding, using her position to attempt to convince a sentencing judge to show her friend leniency.

Moreover, Nolan's argument based on Wainwright's deposition testimony does not even reach her violation by attending the trial in full uniform and indicating to all involved that McCoy had the support of an ODRC corrections officer or based on Nolan contacting the presentence report author on his behalf.

Thus, nothing that Wainwright said undermined her decision to fire Nolan.

### E. Retaliation

Nolan has abandoned the retaliation claim that she stated in her complaint regarding her 2018 two-day suspension by not addressing it in her briefing on this motion. *Responsible Envtl.*

13

*Solutions Alliance*, No. 3:04cv013, 2011 WL 382617, at *12, n.39 (S.D. Ohio 2011). Even had she pursued it, however, the retaliation claim she stated in the complaint is untenable. Her complaint simply confuses the relevant events.

In her complaint, Nolan defines her protected activity as her "report of the behavior of Labor Relations Officer Phil Radar [sic] and his discipline related to the December 18, 2018 incident." (Doc. 1, pgID 6). She pleads the allegedly retaliatory action is that she "received additional discipline and was eventually terminated." (*Id.*).

The "discipline related to the December 18, 2018 incident" was Nolan's termination. Her report of Rader's allegedly discriminatory conduct came in her June 11, 2019 EEOC filing. (Doc. 24-1, pgID 1803). She cannot rationally argue that MCI terminated her employment in retaliation for an EEOC report, that she filed well after that termination already had occurred.

In her summary judgment motion, Nolan attempts, without amending her complaint, to change her allegations to address discipline she received for conduct she committed after her June 2020 reinstatement. (Doc. 25, pgID 1963). Her new retaliation argument stems from the August 2020 Aramark Incident. In that incident, she claims to have followed prison regulations by not allowing an Aramark employee to return to his or her car unescorted to retrieve identification. She did so in violation of a direct order from a Lieutenant and then, initially refused to comply with a Captain's order.

Nolan's failure to amend her complaint to state a claim regarding the Aramark Incident, itself, is a sufficient basis to reject any reliance on the 2020 events. "A party may not raise a new claim for the first time in a response to a motion for summary judgment." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing *West v. Wayne Cnty.*, 672 F. App'x 535, 541 (6th Cir. 2016)).

14

Even apart from her failure to amend the retaliation claim to address the Aramark Incident, Nolan's failure to file a charge with the EEOC regarding that incident also bars her from raising claims relating to it. "[A] an employee alleging employment discrimination in violation of the statute must first file an administrative charge with the EEOC . . . ." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010); s*ee also Jordan v. United States Dep't. of Educ.*, No. 1:05-CV-1066, 2006 WL 1305073, at *5 (N.D. Ohio) (Manos, J.) (termination that occurred during litigation of discrimination claim could not be considered because plaintiff had not submitted it to the EEOC). Because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice. . . administrative remedies must be exhausted for each discrete incident of retaliation." *Id.* (citations omitted).

Nolan argues that her claim that arose in 2020 is properly before me because it "can be reasonably expected to grow out of the EEOC charge." (Doc. 27, pgID 2035) (quoting *Delisle v. Brimfield Twp. Police Dep't*, 94 F. App'x 247, 253 (6th Cir. 2004)). As Nolan herself recognizes, however, "the administrative exhaustion requirement's purpose is, at least in part, to put potential defendants on notice while giving the EEOC the opportunity to investigate and, if possible, to mediate claims . . . ." *Delisle, supra*, 94 F. App'x at 254. When, as in *Delisle*, the allegedly retaliatory action occurs after the employee filed an EEOC complaint but while the EEOC is investigating the claim, "the EEOC would have already had the opportunity to investigate, making a second filing unnecessary." *Id.*

Here, however, the EEOC closed its investigation and issued Nolan a "right to sue" letter on January 29, 2020. (Doc. 1, pgID 9). The incident on which she now attempts to base her retaliation claim did not occur until August 22, 2020. (Doc. 24-1, pgID 1863). MCI did not

15

impose the resulting disciplinary suspension on Nolan until November 2020. (*Id.*, pgID 1846). Thus, the EEOC has never had the opportunity to investigate Nolan's charges relating to that suspension because Nolan failed to file a charge regarding it.

For that reason, "employment actions taken after the receipt of a Right to Sue letter from the EEOC are necessarily outside the scope of the agency's investigation." *Gipson v. Dep't of Rehab. & Corr.*, No. 2:18-CV-315, 2020 WL 1233638, at *7 (S.D. Ohio); Where "the alleged retaliation occur[s] after [the employee's] receipt of the Right to Sue Letter, the Court cannot conclude that Plaintiff's retaliation claim fell within the scope of the agency investigation." *Scheafer v. United States Postal Serv.*, 254 F. Supp. 2d 741, 752 (S.D. Ohio 2002).

Thus, even if Nolan had included the alleged 2020 retaliation in her 2021 complaint, that cause of action still would not properly be before me in this case because she did not exhaust her remedies regarding a claim of retaliation with the EEOC.[5]

In sum, Nolan both has abandoned her retaliation claim based on the 2018 disciplinary suspension and is barred from asserting her claims based on the Aramark Incident. I, therefore, grant summary judgment to MCI on Nolan's retaliation claim.

**Conclusion**

Nolan has presented no direct evidence of discrimination and she has failed to identify any valid comparators to show that MCI disciplined any similarly situated male employee less severely than she. Indeed, she has not introduced any evidence that could lead a jury reasonably

---

[5] Moreover, were a retaliation claim based on the Aramark incident properly before me, it still would be meritless. Nolan has not asserted that her superiors lacked the authority to direct her to release the Aramark employee unescorted. Nor has she explained how the existence of a prison rule justified her disobeying direct orders from her superior officers to make an exception to the rule in that instance. And she has not alleged that any male comparator received less severe discipline than she for similar conduct.

to conclude that MCI or any of its officials had a discriminatory animus, let alone that they acted out of such an animus in disciplining her.

Accordingly, it is therefore ORDERED THAT:

1. Defendant's Motion for Summary Judgment shall be, and the same hereby is, granted on all claims;

2. Plaintiff's Motion for Summary Judgment shall be, and the same hereby is denied on all claims; and

3. The Clerk of Court shall mark this case closed.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge